29 C.C.P.A. (Patents)

## In re HILL.

### Patent Appeal No. 4635.

Court of Customs and Patent Appeals.
July 6, 1942.

Ellis S. Middleton, of New York City, for appellant.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel) for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting all of the claims, 1 to 7 inclusive, 11 to 20 inclusive and 22, of an application for a patent for "Treatment of Liquids to Control Crystal Formation". The ground for rejection is that the claims fail to define anything patentable over the prior art.

Claims 1 and 14 are illustrative and read as follows:

"1. A method of obtaining uniformly sized crystals of a solute from a solution thereof in a solvent in which there is also dissolved a fluid, the solute having a different solubility in the solvent containing the fluid than in the solvent alone, which includes varying the solubility of the solute therein by varying the amount of fluid dissolved in said solvent, until a number of crystal nuclei are formed, and thereafter changing a previously existing condition selected from the group consisting of amount of fluid dissolved in the solvent, the temperature, and amount of solvent, but in any event the amount of fluid dissolved in the solvent, to an extent which will maintain the solution in a metastable state for a materially longer period than would otherwise occur if no change were made and will produce substantial uniformity of crystal growth."

"14. A method of crystallizing a solute from a solution thereof in a solvent which includes decreasing its solubility therein by varying the vapor pressure of the solution with respect to a fluid above the said solution, which fluid is soluble in said solvent in which the temperature of the solution is lowered concurrently with the variation in the vapor pressure of the fluid above the solution."

The references cited are:
Cameron, 1,276,870, August 27, 1918.
Cocksedge, 1,845,742, February 16, 1932.
Guillissen, 1,879,204, September 27, 1932.
Tennant, (Brit.), 392,829, May 25, 1933.
Dering, 1,922,283, August 15, 1933.
Prins et al., 1,955,016, April 17, 1934.
Gensecke, 2,034,615, March 17, 1936.
Freedman, 2,046,507, July 7, 1936.
Gluud et al., 2,071,282, February 16, 1937.
Seidell, Solubilities of Inorganic & Organic Compounds, Vol. 1, page 63.
Mellor, Inorganic and Theor. Chemistry, Vol. 1, pages 995, and 996.

The claimed invention relates to a method of forming and producing crystals of uniform size. The crystals are formed in and precipitated from a solution in which the solubility of the crystal forming substance contained therein is decreased by the addition of another substance. The illustrative example set out in the application is the formation of crystals of ammonium sulfate, which are produced by slowly adding ammonia to the ammonium sulfate solution in the metastable zone, whereby, it is alleged, large and uniformly sized crystals of ammonium sulfate may be obtained. The expression "metastable" is defined in Hackh's Chemical Dictionary as follows:

"An unstable condition which changes readily, either to a more stable form, or to a less stable condition."

While many references have been cited, we think it necessary to discuss only the Gensecke patent and the Cameron patent,

which is the basic reference relied upon by the Patent Office. The other references are cumulative and all pertain generally to the production of precipitates in the chemical art.

The patent to Cameron relates to a "Process of Treating Phosphoric-Acid Solutions". While the patent does not state that the process produces crystals of uniform size it discloses ammonium phosphate as the solute, phosphoric acid as the solvent and ammonia gas as the fluid dissolved in the solvent. The patentee describes his process as follows:

"Phosphoric acid solutions derived from any source but in excess of a certain minimum concentration, are treated with gaseous ammonia, $NH_3$, the supply of ammonia being continued not only to complete neutralization of the phosphoric acid, but to practical saturation, at the pressure and temperature employed, of the liquid. Under these conditions I have found that tri-ammonium-phosphate is formed and is precipitated practically quantitatively.

"The reaction succeeds with phosphoric acid solutions of all concentrations in excess of 12 to 13 per cent. $P_2O_5$, such solutions being herein referred to as 'strong solutions'. With solutions of materially lower concentrations than this the same results are not attainable, at least at normal pressures and temperatures.

"The reaction is facilitated and rendered even more complete by the use of pressures in excess of atmospheric. For this purpose superatmospheric pressures of one to five pounds will suffice, although higher pressures may of course be used. The effect of such increased pressures is presumably to increase the concentration of ammonia in the solution, and thereby to accelerate and render more complete the formation and precipitation the tri-ammonium-phosphate."

We will discuss the claims on appeal in two groups: claims 11 to 14 inclusive comprising the first group, and claims 1 to 7 inclusive, 15 to 20 inclusive and 22, the second group.

The first group was held by the tribunals below to read directly upon the patent to Cameron. This holding seems to us to be proper. The patent certainly shows the use of different pressures and while it does not expressly refer to the lowering of temperature we think that the result of such change in temperature in connection with varying pressure should be obvious to one skilled in the chemical art.

The second group is concerned with the process of maintaining the solution in a metastable state. The claimed purpose of such maintenance is that the crystal nuclei do not form when the solution is in the metastable state, but when once formed in the supersaturated state and the solution is then brought into the metastable state, the nuclei will grow and become more or less uniform in size.

None of the references mentions the metastable condition except the patent to Gensecke, in which it is stated:

"It is known that coarse crystals, the size of which depends on the duration of the cooling period, can be obtained by gradually cooling saturated solutions of salts of this kind in vessels equipped with cooled stirring mechanism. According to the literature, it is essential that the solution depositing the crystals should remain within the range of the zone of metastable saturation throughout the cooling process. Even during the crystallization of salts from solutions in a condition of metastable saturation, it is possible for a portion of the salt to deposit in a fine-grained condition. If, however, the cooling proceeds very slowly during the condition of metastable saturation, a coarse-grained salt is obtained, provided, of course, a sufficient number of crystals be maintained in suspension in the solution—a condition that can be fulfilled by stirring, or by keeping the entire cooling apparatus in motion."

The appellant in his application attempts to distinguish the alleged invention, from what the known art was stated by him to be, as follows:

"In the crystallizing art, two well known methods of removing substances from solutions are known. The first and perhaps the oldest is that of removing the solvent by evaporation thereof whereupon supersaturation of the substance in the remaining solvent obtains with subsequent crystallization or precipitation of the solute.

"The other well known method is based upon the fact that a solution saturated with a solute at a given temperature will become supersaturated if the temperature is changed.

"The present invention is not dependent upon the principle of the above well known

methods, which is that the volume of salt retained in solution may be varied by varying the ratio of solvent to salt or varying the temperature of the solution. On the contrary, the present invention is based upon the principle that the solubility of a solute in a solvent may be decreased to the point where the solute will be thrown out of solution without removing the solvent or changing the temperature.

"A corollary to the above principle is that if the solubility of the solute is decreased gradually, maintaining it substantially in the meta stable zone, that is, where crystal growth can take place but where no new crystals result, additional solute in the process of being thrown out of solution will build upon the crystals or crystal nuclei already present and thereby form crystals of desirable size and uniformity."

The claims as originally presented were amended prior to the letter of final rejection by the examiner. In that letter the examiner stated as follows:

"In contending that the claims as now drawn are allowable, chief reliance is placed on a further definition of the expression 'maintaining,' as requiring a pause in the progression of crystallization in the meta stable zone. The disclosure however is restricted to causing the solution to pass slowly through the zone. There is no general disclosure of any discontinuity or irregularity in the procedure of salting out the solute after the meta stable condition is reached. Applicant discloses that the fluid used to salt out the solute is slowly added. The specific example is restricted to the formation of ammonium sulphate by adding gaseous ammonia to the solution. The only disclosure as to rate is a comparison of total time in different experiments. If for instance approximately the same amount of ammonia is added over a period of seven hours as in one hour a great increase in the amount of larger sized crystals is obtained with a greater uniformity of size. There is no disclosure of any variation in the rate of addition of ammonia in the sense that in the same crystallization operation the rate is varied. Of course even with a constant rate of addition the amount of ammonia present is varied as stated in the claims. The further definition of the expression is not sustained by the disclosure and can have no effect in patentably differentiating the claims over the cited art."

Subsequent to the final rejection appellant proposed an amendment modifying claims 1, 2, 3, 16, 18, 19 and 22. The examiner refused to enter the said amendment and rejected all of the involved claims, stating in his "Summary" as follows:

"It has been clearly established that claims 1–7, 15–20 and 22 attempt to distinguish over the references in functionally stating a theoretical result, which is inevitably present in the method of the references. There is no definite criterion stated in the claims of the length of time the solution is maintained in the metastable state, or of the size or uniformity in size of the crystals. The claims do not state any means or method, other than the means stated in a few of the claims, obviously or inevitably to be adopted in following the reference methods, of varying the third component, the fluid, but include any constant rate of addition of the ammonia or third component from beginning to end of the crystallization. The theory advanced in the claims is of such nature that it would be impossible to determine infringement of the claims, even if they were held free of the references, because the references fail to describe and acknowledge the well-known theory of crystallization. Growth occurs in the metastable zone, even if the ammonia gas is rapidly added.

"It has further been pointed out that claims 11–14 are vague and indefinite in the meaning of the expression 'varying' and read directly on the prior art."

In accordance with a decision of the Supervisory Examiner, the amendment was ordered entered. The Primary Examiner considered the said claims as amended and repeated his original reasons for rejecting all of the claims, setting out in a supplemental statement the following:

"The same rejection and discussion of the invention set forth in the original examiner's statement applies to the claims as amended. Applicant's specific discovery was that extending the time it takes to absorb a given quantity of ammonia in the production of ammonium sulphate over that which would usually give fine irregularly sized crystals, i. e., slowing the rate of addition of ammonia, resulted in a greater uniformity of size and a generally

larger crystal size. He is endeavoring to extend this discovery without support in his specification by statements of theory in the claims. The theory is old but naturally is not discussed by many of the patents that in fact involve it. Mere theory is not patentable. The result is that the claims not only definitely read upon the prior art, but because of the indefinite and indeterminate nature of the theory, would be impossible to evaluate in the determination of infringement. The claims are broader than applicant's disclosure, not only from a chemical viewpoint, but in covering process steps of changing the rate of addition of the ammonia or fluid added during the course of the process. Applicant has disclosed only that the rate of addition is slower than that used in the prior art with which he was acquainted. This slower rate of addition might be constant and still achieve the result, as illustrated by the only disclosed example."

. The patent to Gensecke states that "According to the literature" the solution should remain in the metastable state throughout the cooling process. Apparently the patentee had reference to what is known as the "Miers theory".

That theory and comments thereon as set out in Chemical Engineers' Handbook, 1934, pages 1472, 1473, appear as follows:

"The most interesting proposal with regard to the extent of the supersaturation possible for a given solution is the supersolubility theory of Miers [J. Inst. Metals, 37, 331–350 (1927)]. Miers postulates a definite supersolubility curve plotted on the high-concentration side of the normal solubility curve. For concentrations between the solubility and supersolubility curves, the equilibrium is considered to be metastable, and supersaturated solutions can exist here as long as they are not seeded. On the high-concentration side of the supersolubility curve, the region corresponds to labile conditions, and solutions represented by points in this region will spontaneously crystallize until the concentration of the solution falls to that demanded by the normal solubility curve.

\*     \*     \*     \*     \*

"The Miers theory is difficult to test conclusively by direct experiment, and considerable controversy on the subject has resulted. This controversy is mainly centered on the question as to how definite is the boundary between the supersaturated and labile fields, and whether or not the boundary is independent of such factors as rate of stirring and mechanical shock. Whether or not the theory will be finally verified in all details, it presents a useful conception; and the metastable field can be visualized as a region, possibly conditioned by stirring, wherein crystal growth can take place substantially without accompanying nucleus formation."

Nowhere in the latter group of claims does it appear definitely, if at all, how, in what manner, or to what extent, the "previously existing condition" is changed so that the solution can be maintained in a metastable state. We are of opinion, as were the tribunals below, that the claims in the latter group are "mere nebulous statements of the theory of crystallization as applicant applies the theory". Certainly a mere statement in the claims of the latter group that a previously existing condition of the solution is changed, without definitely showing how the change is made, to maintain the solution in a metastable state, cannot render the claims patentable over the prior art in which is shown the production of crystals from a solution containing a solute, a solvent, and a fluid to be dissolved in the solvent. We think the board was justified in stating in its decision that:

" \*  \*  \* The theory uses the old concept of the 'meta stable zone', i. e., a zone or range of conditions where no new crystal nuclei are formed but wherein those already formed grow. The result is said to be uniformity in the size of the crystals (line 28, page 3, specification). However, if the 'Screen Analyses' of applicant's crystals (specification, page 5) is inspected, it is apparent that the crystals are not of uniform size. Thus, if the theory of the meta stable zone is correct, applicant must have had some difficulty in locating the limits of this zone, nor do we believe anyone else could definitely determine such a zone and that it would be impossible to determine infringement of the claims."

In passing, we mention that no oral argument was made here by appellant on the highly technical issues presented.

The decision of the Board of Appeals is affirmed.

. Affirmed.